# EXHIBIT A



December 7, 2021

Lynn Parker Dupree
Privacy Office, Mail Stop 0655
Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528-065

Freedom of Information Act Office
Immigration and Customs Enforcement
500 12th Street, SW, Stop 5009
Washington, D.C. 20536-5009

FOIA Officer
U.S. Customs and Border Protection
90 K Street, NE
FOIA Division
Washington, D.C. 20229

Via: Department of Homeland Security Freedom of Information Act Public Access Portal
and FOIAOnline.

### Re: Freedom of Information Act Request

Dear Sir or Madam:

This is a request to the Department of Homeland Security (DHS), the Office of Intelligence
and Analysis (I&A), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs
and Border Protection (CBP) (collectively referred to below as "DHS" or "the
Department"), under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and DHS
implementing regulations, 6 C.F.R. §§ 5.1 through 5.36. It is also a request for expedited
processing under 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(6), and for a fee waiver under
5 U.S.C. §§ 552(a)(4)(A)(ii) and (iii) and 6 C.F.R. §§ 5.11(d) and (k).

### Background

In general, "social media monitoring" is a term describing the use of social media platforms
like Facebook, Twitter, Snapchat, and Instagram to gather information for purposes
including, but not limited to, identifying potential threats, reviewing breaking news,

collecting individuals' information, conducting criminal investigations and intelligence, and gauging public sentiment.

Social media monitoring includes four types of activities: (1) monitoring or tracking an individual, a group, or an affiliation (*e.g.*, an online hashtag) via publicly available information; (2) using an informant, a friend of the target, or an undercover account to obtain information from a protected, private, or otherwise unavailable account or page; (3) using software like Voyager Labs' VoyagerAnalytics, Logically, Inc. products like Logically Intelligence, or ShadowDragon products such as SocialNet or OI Monitor to monitor individuals, groups, associations, or locations; or (4) issuing a subpoena, warrant, or other form of legal process to a social media platform for data held by that platform.

Social media is a crucial forum for the exchange of ideas, particularly in this time of unprecedented public activism and political engagement. Social media platforms like Facebook, Twitter, and Instagram have proven to be an invaluable tool for connecting and organizing around a variety of issues and across diverse movements. In a time when social media is recognized as akin to the "modern public square,"[1] social media monitoring has significant civil rights implications. Like other forms of surveillance, social media monitoring impacts what people say and with whom they interact online. The deleterious effects of surveillance on free speech have been well documented in empirical research.[2] The use of third-party vendors to facilitate social media monitoring raises additional concerns, including reduced transparency regarding the scope and capabilities of these services.

Publicly available records indicate DHS engages vendors to support its social media monitoring efforts. For example, an article in the *Intercept* revealed that ICE had two

---

[1] *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (quoting *Reno v. Am. Civ. Liberties Union*, 521 U. S. 844, 868 (1997)).

[2] *See, e.g.,* Faiza Patel et al., *Social Media Monitoring*, BRENNAN CENTER FOR JUSTICE (May 22, 2019), https://www.brennancenter.org/publication/social-media-monitoring; Jonathon W. Penney, *Chilling Effects: Online Surveillance and Wikipedia Use*, 31 BERKELEY TECH. L. J. 1, 117-182 (2016), https://btlj.org/data/articles2016/vol31/31_1/0117_0182_Penney_ChillingEffects_WEB.pdf; Elizabeth Stoycheff, *Under Surveillance: Examining Facebook's Spiral of Silence Effects in the Wake of NSA Internet Monitoring*, 93 JOURNALISM AND MASS COMM. Q. 2, 296-311 (2016), https://journals.sagepub.com/doi/pdf/10.1177/1077699016630255#articleCitationDownloadContainer; Matthew A. Wasserman, *First Amendment Limitations on Police Surveillance: The Case of the Muslim Surveillance Program*, 90 N.Y.U. L. REV. 5, 1786-1826 (2015), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-90-5-Wasserman.pdf.

contracts for ShadowDragon products.[3] On the federal procurement website usaspending.gov, the Brennan Center located three ICE contracts to purchase ShadowDragon products, specifically OI Monitor and SocialNet.[4] Another company, Voyager Labs, markets its materials as useful for issue areas in which DHS operates – including matters in its exclusive authority, like border security.[5] In addition, DHS officials have stated publicly that the Department is seeking third-party vendors to enhance its social media monitoring efforts in the wake of the January 6, 2021 insurrection.[6] While those vendors have not been definitively identified, DHS has had at least preliminary conversations with Logically, Inc.[7]

Thus, despite widespread public interest in social media monitoring by law enforcement and security officers,[8] and some sparse publicly available information about vendors with

---

[3] Michael Kwet, *ShadowDragon: Inside the Social Media Surveillance Software that can Watch Your Every Move*, INTERCEPT (Sept. 21, 2021), https://theintercept.com/2021/09/21/surveillance-social-media-police-microsoft-shadowdragon-kaseware/.

[4] *E.g.*, Contract between DHS and Panamerica Computers, Inc., USASPENDING, https://www.usaspending.gov/award/CONT_AWD_70CMSD21FR0000107_7012_HSHQDC12 D00013_7001 (last visited Dec. 7, 2021); Contract between DHS and C & C International Computers & Consultants, Inc., USASPENDING, https://www.usaspending.gov/award/CONT_AWD_70CMSD20FR0000090_7012_HSHQDC12 D00011_7001 (last visited Dec. 7, 2021); Contract between DHS and Software Information Resource Corp., USASPENDING, https://www.usaspending.gov/award/CONT_AWD_70CMSD21FR0000080_7012_NNG15SD74 B_8000 (last visited Dec. 7, 2021).

[5] *Border Security*, VOYAGER LABS, https://voyagerlabs.co/solutions/border-security/ (last visited Nov. 2, 2021); *National Security*, VOYAGER LABS, https://voyagerlabs.co/solutions/national-security/ (last visited Nov. 2, 2021).

[6] Rachael Levy, *Homeland Security Considers Outside Firms to Analyze Social Media After Jan. 6 Failure*, WALL ST. J. (Aug. 15, 2021), https://www.wsj.com/articles/homeland-security-considers-outside-firms-to-analyze-social-media-after-jan-6-failure-11629025200

[7] *Id.*

[8] *See, e.g.,* Johana Bhuiyan & Sam Levin, *Revealed: the software that studies your Facebook friends to predict who may commit a crime*, GUARDIAN (Nov. 17, 2021), https://www.theguardian.com/us-news/2021/nov/17/police-surveillance-technology-voyager; Sam Levin & Johana Bhuiyan, *Exclusive: LAPD partnered with tech firm that enables secretive online spying*, GUARDIAN (Nov. 17, 2021), https://www.theguardian.com/us-news/2021/nov/17/los-angeles-police-surveillance-social-media-voyager; Sam Levin, *Revealed: LAPD officers told to collect social media data on every civilian they stop*, GUARDIAN (Sept. 8, 2021), https://www.theguardian.com/us-news/2021/sep/08/revealed-los-angeles-police-officers-gathering-social-media; Leah Hope, *Chicago police monitor social media as crime-fighting strategy; sociologist, ACLU urge caution*, ABC7 EYEWITNESS NEWS (Aug. 13, 2020), https://abc7chicago.com/chicago-police-aclu-columbia-university-professor-desmond-patton-alderman-brendan-reilly/6369604/; Kwet, *supra* note 3.

whom the Department has contracted or may be contracting, the public lacks sufficient insight into the current capabilities and limitations of DHS's social media monitoring operations, including its use of third-party providers. Accordingly, we seek information and documents about the nature of social media monitoring services provided or marketed by Voyager Analytics, Logically, Inc., or ShadowDragon, or any of their affiliates or subsidiaries (collectively referred to below as "Voyager Analytics, Logically, Inc., or ShadowDragon"), to DHS.

## **Request**

The Brennan Center specifically requests records under FOIA that were in DHS's possession or control from January 1, 2016, through the date of the production of records, in the following categories:

1. **Recordkeeping**: All recordkeeping, logs, or digests reflecting the use of Voyager Labs, Logically, Inc., or ShadowDragon products or services for social media monitoring, or searches of social media for purposes including criminal investigations, situational awareness, preparation for events, monitoring of protests or other gatherings, or public safety.

2. **Purchase Agreements and Orders**: All records reflecting a contract or agreement to purchase, acquire, use, test, license, or evaluate any product or service developed by Voyager Labs, Logically, Inc., or ShadowDragon.

3. **Use for Purposes Other Than Background Checks:** All records reflecting the number of circumstances in which Voyager Labs, Logically, Inc., or ShadowDragon products or services were used to collect information about individuals from social media for purposes other than background checks for DHS employment, including regarding protest activity, as well as the number of such matters in which an individual or group was referred to prosecutors.

4. **Audits**: All records of, or communications regarding, audits or internal reviews of the Department's use of Voyager Labs, Logically, Inc., or ShadowDragon products or services.

5. **Training Materials**: All training documents pertaining to the use of Voyager Labs, Logically, Inc., or ShadowDragon products or services, including drafts, and including but not limited to PowerPoint presentations, handouts, manuals, or lectures.

4

6. **Legal Justifications**: All records reflecting final agency memoranda articulating the legal justification(s) for the use of Voyager Labs, Logically, Inc., or ShadowDragon products or services, or other social media monitoring services.

7. **Information Sharing Communications**: All communications with the Federal Bureau of Investigation, state or local law enforcement agencies, or fusion centers, regarding use of Voyager Labs, Logically, Inc., or ShadowDragon products or services or information obtained from those products or services. This includes, but is not limited to, communications regarding information sharing in response to protests from May 2020 through August 2020.[9]

8. **Nondisclosure Agreements**: All records regarding DHS's nondisclosure or confidentiality obligations in relation to contracts or use agreements with Voyager Labs, Logically, Inc., or ShadowDragon.

9. **Vendor Communications:** All email communications with representatives of Voyager Labs, Logically, Inc., or ShadowDragon concerning their social media monitoring products or services, including the attachments to those emails.

10. **Internal Communications:** All email communications among DHS employees, officials, or contractors regarding social media monitoring products or services offered by Voyager Labs, Logically, Inc., or ShadowDragon, including the attachments to those emails.

## Expedited Processing

The Brennan Center requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). There is a "compelling need" for these records because the information

---

[9] *See, e.g.,* DEP'T OF JUSTICE OFFICE OF PUB. AFFAIRS, ATTORNEY GENERAL WILLIAM P. BARR'S STATEMENT ON PROTESTS IN WASHINGTON, D.C. (June 2, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-protests-washington-dc; Elizabeth Crisp, *Leaked Document Shows SWAT Teams, Sniper-trained Units Sent to D.C. Amid Protests,* NEWSWEEK (June 5, 2020), https://www.newsweek.com/leaked-document-shows-swat-teams-sniper-trained-units-sent-dc-amid-protests-1509087; Colleen Long et al*., Trump's show of federal force sparking alarm in cities*, WASH. POST (July 21, 2020), https://www.washingtonpost.com/politics/courts_law/trump-to-send-federal-agents-to-chicago-maybe-other-cities/2020/07/21/af5c5a98-cb67-11ea-99b0-8426e26d203b_story.html; Jasmine Aguilera, *ICE Agents Detain a Police Brutality Protester, Reportedly a U.S. Citizen and Military Vet, in New York City*, TIME (June 6, 2020), https://time.com/5849517/protester-new-york-city-protests-immigration-ice/; Zolan Kanno-Youngs*, U.S. Watched George Floyd Protests in 15 Cities Using Aerial Surveillance*, NEW YORK TIMES (June 19, 2020), https://www.nytimes.com/2020/06/19/us/politics/george-floyd-protests-surveillance.html.

requested is urgently required by an organization "primarily engaged in disseminating information" to "inform the public concerning actual or alleged Federal Government activity." U.S.C. §§ 552(a)(6)(E)(i)(I), (a)(6)(E)(v); 6 C.F.R. § 5.5(e)(1)(ii).

The Brennan Center is a section 501(c)(3) non-profit organization that is "primarily engaged in disseminating information." 5 U.S.C. § 552(a)(6)(E)(v)(II) and 6 C.F.R. § 5.5(e)(1)(ii). The U.S. District Court for the District of Columbia has found that a non-profit, public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" is "primarily engaged in disseminating information" within the meaning of the statute and regulations. *Am. Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (quoting *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 11 (D.D.C. 2003)). The Brennan Center regularly writes and publishes reports and articles and makes appearances on various media outlets, addressing U.S. policy issues ranging from counterterrorism efforts to voting rights to campaign finance laws, and it will continue to do so for the foreseeable future.[10] *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Commerce*, 498 F. Supp. 3d 87, 98 (D.D.C. 2020) ("Defendants do not dispute the Brennan Center's status as an organization 'primarily engaged in disseminating information,' and other courts have found that similar organizations meet this standard.").

Furthermore, the Brennan Center urgently requires the information sought by this request to inform the public of federal government activity: DHS's purchase and use of social media monitoring products or services. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(e)(1)(ii). This information is of interest to the many members of the general public concerned about agencies like DHS monitoring and recording their social media activity[11]. Civil society organizations are also seeking greater clarity about the collection of social

---

[10]A complete list of the Brennan Center's recent publications is available at, https://www.brennancenter.org/search/?type=analysis,archive,policy_solution,report,resource,statement,testimony,fact_sheet,explainer,series,expert_brief,legislation,newsletter,project&.

[11] *See, e.g.,* Kevin Matthews, *Don't Spy on Immigrants' Social Media*, CARE2 PETITIONS, https://www.thepetitionsite.com/143/518/650/dont-spy-on-immigrants-social-media-accounts-dhs/ (last visited Dec. 7, 2021); *BREAKING: Homeland Security is spying on 40 million Americans and anyone they talk to online*, ACTION NETWORK, https://actionnetwork.org/petitions/breaking-dhs-will-begin-collecting-social-media-information-on-immigrants-green-card-holders-naturalized-citizens-and-anyone-in-touch-with-them (last visited Dec. 7, 2021).

media data by federal agencies.[12] The Brennan Center intends to share any information about the use of Voyager Analytics, Logically, Inc., or ShadowDragon to surveil social media that it obtains through this request with the public.

**<u>Fee Waiver</u>**

The Brennan Center also requests a waiver of all search, review, and duplication fees associated with this request. The requester is eligible for a waiver of search and review fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 6 C.F.R. §§ 5.11(d) and (k), and for a waiver of all fees, including duplication fees, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k)(1).

First, the Brennan Center plans to analyze, publish, and publicly disseminate information obtained from this request. The requested records are not sought for commercial use and will be disclosed to the public at no cost.

Second, the Brennan Center qualifies as a "representative of the news media" for the same reasons that it is "primarily engaged in dissemination of information." The Brennan Center "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *Nat'l Sec. Archive v. Dep't of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). It uses this information to draft reports on, and analyses of, issues of public concern.[13] *Cf. Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d at 11-12 (finding that the Electronic Privacy Information Center was representative of the news media based on its publication

---

[12] *See, e.g.,* Patel, et al., *supra* note 2; *ACLU v. DOJ: FOIA Lawsuit Seeking Information on Federal Agencies' Surveillance of Social Media*, AM. CIV. LIBERTIES UNION https://www.aclu.org/cases/aclu-v-doj-foia-lawsuit-seeking-information-federal-agencies-surveillance-social-media (last updated Mar. 26, 2019)

[13] *See, e.g.,* Harsha Panduranga, *Community Investment, Not Criminalization*, BRENNAN CENTER FOR JUSTICE (June 17, 2021), https://www.brennancenter.org/our-work/research-reports/community-investment-not-criminalization; Rachel Levinson-Waldman & Harsha Panduranga, *Invasive and Ineffective: DHS Surveillance Since 9/11*, BRENNAN CENTER FOR JUSTICE (Sept. 15, 2021), https://www.brennancenter.org/our-work/analysis-opinion/invasive-and-ineffective-dhs-surveillance-911; Laura Hecht-Felella, *The Fourth Amendment in the Digital Age*, BRENNAN CENTER FOR JUSTICE (Mar. 18, 2021), https://www.brennancenter.org/sites/default/files/2021-03/Fourth-Amendment-Digital-Age-Carpenter.pdf; Rachel Levinson-Waldman & Ángel Díaz, *How to Reform Police Monitoring of Social Media*, BRENNAN CENTER FOR JUSTICE (July 9, 2020), https://www.brennancenter.org/our-work/analysis-opinion/how-reform-police-monitoring-social-media.

of seven books about national and newsletter relating to privacy and civil rights); *see also Nat'l Sec. Archive*, 880 F.2d at 1386 (deeming the National Security Archive a representative of the news media after it published one book and indicated its intention to publish a set of documents on national and international politics and nuclear policy). The Brennan Center is therefore entitled to a waiver of search and review fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 6 C.F.R. §§ 5.11(e).

The Brennan Center also is also entitled to a waiver because it is an "educational institution." 6 C.F.R. §§ 5.11(d). The Brennan Center qualifies as an educational institution because it is affiliated with New York University School of Law, which is plainly an educational institution under the definition provided in 6 C.F.R. § 5.11(d)(1).

The Brennan Center is also entitled to a waiver of all fees, including duplication fees. First, the subject of the requested records clearly concerns "the operations or activities of the federal government," namely DHS's social media monitoring. 5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. § 5.11(k)(1). This connection to the federal government is "direct and clear, not remote or attenuated." *See* 6 C.F.R. § 5.11(k)(2)(i). Disclosure of the requested records is also in the public interest, because it is "likely to contribute to an increased public understanding" of how and to what extent the agency is engaging in social media monitoring. *See* 6 C.F.R. §§ 5.11(k)(2)(ii). Given the dearth of public information on DHS's involvement with and expenditures on social media monitoring activity, disclosure will significantly enhance the public's understanding of this subject. *See* 6 C.F.R. § 5.11(k)(2)(iv).

Finally, disclosure is not primarily in the Brennan Center's commercial interests. *See* 6 C.F.R. § 5.11(k)(3). As stated above, the Brennan Center plans to make any information disclosed as a result of this request available to the public at no cost. A fee waiver would therefore fulfill Congress's legislative intent that FOIA be "liberally construed in favor of waivers for noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987) (quoting 132 CONG. REC. 27, 190 (1986) (Statement of Sen. Leahy)).

Should DHS choose to charge a fee, please inform me via email of the total charges in advance of fulfilling this request at [dwyerm@brennan.law.nyu.edu](mailto:dwyerm@brennan.law.nyu.edu).

**Response Required**

The Brennan Center appreciates DHS's attention to this request and expects to receive a response on its request for expedited processing within ten (10) business days. *See* 5 U.S.C.

8

§ 552(a)(6)(E)(ii)(I); 6 C.F.R. § 5.5(e)(4). I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi); 6 C.F.R. § 5.5(e)(3).

We also request that you provide us with an estimated completion date, as required by 5 U.S.C. § 552(a)(7)(B)(ii). If the Request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to FOIA. 5 U.S.C. § 552(a)(2). We expect the release of all segregable portions of otherwise exempt material. 5 U.S.C. § 552(a)(8)(ii)(II).

We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees. We also request that you provide us with the documents in electronic format where possible.

Should you have any questions concerning this request, please contact me via e-mail at dwyerm@brennan.law.nyu.edu.

Sincerely,

*/s/ Mary Pat Dwyer*

Mary Pat Dwyer
Fellow, Liberty & National Security
Program

9